UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br><br>v.<br><br>STRATEGIC GLOBAL INVESTMENTS, INC. et al.,<br><br>                              Defendants. | Case No.: 16-cv-514 JLB (WVG)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[ECF No. 22]** |

This is a Securities and Exchange Commission enforcement action against Defendants Strategic Global Investments, Inc. and Andrew Fellner related to their entrance into the Colorado retail marijuana industry. Plaintiff's First Amended Complaint alleges that in early 2014, Defendants issued press releases and a Form 1-A Filing that contained false and misleading information in violation of Section 10(b) of the 1934 Securities Exchange Act and SEC Rule 10b-5 promulgated thereunder, and Section 17(a)(2) of the 1933 Securities Act. (ECF No. 18 at 9.) In addition, the operative complaint alleges that Defendant Fellner aided and abetted Defendant Strategic's violations of the same. (*Id.* at 10–11.)

Plaintiff SEC now moves for summary judgment against Defendants Strategic and Fellner as to their violations of Section 10(b) of the 1934 Exchange Act and SEC Rule

1

10b-5 only. (ECF No. 22.) Defendants oppose the motion. (ECF No. 24.) The Court held a hearing on Plaintiff's motion for partial summary judgment on March 16, 2017. (*See* ECF No. 31.) Having considered the parties' papers, supporting evidence, and oral arguments, and for the reasons set forth below, the Court hereby **GRANTS** Plaintiff's motion. (ECF No. 22.)

## I.     FACTUAL BACKGROUND

Defendant Strategic is a San Diego-based, Delaware corporation that was formed in 2008. (ECF No. 18, ¶ 11; ECF No. 19, ¶ 9.) Strategic's common stock is a penny stock that is traded on the OTC Pink marketplace. (ECF No. 18, ¶¶ 11–12; ECF No. 19, ¶¶ 9–10; ECF No. 24 at 2.)

Defendant Fellner, a resident of Carlsbad, California, acquired a controlling interest in Strategic in 2010. (ECF No. 18, ¶ 13; ECF No. 19, ¶ 11.) Fellner serves as the Chief Executive Officer, Secretary, Treasurer, and Sole Director of Strategic. (*Id.*)

### A.     Legalization of Recreational Marijuana in Colorado

On November 6, 2012, Colorado voters approved Amendment 64, which legalized recreational marijuana in Colorado as a matter of state law. On December 10, 2012, the State of Colorado amended its constitution to provide that the use of marijuana should be legal in the state and regulated in a manner similar to alcohol. Colo. Const. art. 18, § 16(1)(a). On May 28, 2013, the Colorado legislature enacted the Colorado Retail Marijuana Code, Colo. Rev. Stat. § 12-43.4-101 *et seq.*, which provides the statutory framework for the regulation of retail marijuana establishments in the State. Two aspects of the constitutional amendment and its implementing regulations are relevant to this action.

First, the Colorado Retail Marijuana Code prohibits all retail marijuana establishments, including marijuana cultivation facilities, from operating until licensed by the Colorado State Licensing Authority and approved by the local jurisdiction. Colo. Rev. Stat. §§ 12-43.4-103(17), -309(2) (2016). At all times relevant to this action, the Code prohibited the issuance of a marijuana cultivation facility license to "[a]n owner who has

not been a resident of Colorado for at least two years prior to the date of the owner's application." Colo. Rev. Stat. § 12-43.4-306(k) (2013). The Code defined "owner" to mean "any person having a beneficial interest, as defined by the state licensing authority in a retail marijuana establishment other than a holder of a permitted economic interest." Colo. Rev. Stat. § 12-43.4-103(12) (2013).

The Colorado State Licensing Authority promulgated rules related to Colorado's Retail Marijuana Code on September 9, 2013. *See* 1 Colo. Code Regs. § 212-2 (2013). The rules further defined "owner" as "the Person or Persons[1] whose beneficial interest in the license is such that they bear risk of loss other than as an insurer, have an opportunity to gain profit from the operation or sale of the establishment, and have a controlling interest in a Retail Marijuana Establishment license, and includes any other Person that qualifies as an Owner pursuant to Rule R 204." 1 Colo. Code Regs. § 212-2.103 (2013). Rule R 204.D stated that "ownership of a share or shares in a corporation . . . which is licensed . . . constitutes ownership and a direct financial interest." 1 Colo. Code Regs. § 212-2.204 (2013).

Second, the constitutional amendment provides that any county, municipality, or city may enact an ordinance to prohibit the operation of marijuana cultivation facilities, marijuana product manufacturing facilities, marijuana testing facilities, or retail marijuana stores. Colo. Const. art. 18, § 16(2)(e), (5)(f). In March 2013, Teller County, Colorado, exercised the option to prohibit the operation of all marijuana establishments, including marijuana cultivation facilities, within the unincorporated boundaries of its county. Teller County, Colo., Ordinance 18 (March 14, 2013).

## B. Defendants' Involvement in the Colorado Marijuana Industry

On February 5, 2014, Defendant Strategic entered into a Stock Purchase Agreement with Robert Coffy through which Strategic purchased the only-issued share of common

---

[1] "Person" was defined to mean "a natural person, partnership, association, company, corporation, limited liability company, or organization, or a manager, agent, owner, director, servant, officer, or employee thereof." 1 Colo. Code Regs. § 212-2.103 (2013).

stock in BearPot, Inc., a Colorado Corporation and controlling entity of an existing marijuana cultivation facility in Teller County, Colorado.  (*See* ECF No. 22-14.)  At the time that Strategic acquired BearPot, BearPot's assets included "equipment with a market value of $10,000" and "living plants that are healthy and growing and have a market value of $5,000."  (*Id.*, ¶ 2.01(f).)  BearPot did not own any real property and was leasing its marijuana cultivation facility.  (*Id.*, ¶ 2.01(g).)  Although the Stock Purchase Agreement was executed on February 5, 2014, Robert Coffy did not incorporate BearPot in Colorado until February 14, 2014.  (ECF No. 22-15 at 4.)

Between February 10, 2014, and March 27, 2014, Defendant Strategic issued six press releases via the website www.marketwired.com that chronicled its acquisition of BearPot and entrance into Colorado's recreational marijuana market.  (ECF Nos. 22-7 to 22-12.)  Defendant Strategic specifically identified the purpose of the shareholder letter quoted in the February 24, 2014 press release as being to update existing shareholders and potential investors about Strategic's developments related to its newly acquired Colorado marijuana cultivation facility.  (ECF No. 22-9 at 2.)  The content of the press releases is the subject of the instant motion and discussed in greater detail throughout this order.

By the third quarter of 2014, Strategic decided not to obtain any marijuana licenses from the State of Colorado and not to pursue further its marijuana business.  (ECF No. 24 at 3–4.)  Strategic abandoned BearPot in October 2014.  (*Id.* at 4.)

C.    **SEC Subpoena**

On July 9, 2014, the SEC issued to Strategic a subpoena seeking documents that supported some of the statements Strategic made in its February and March 2014 press releases.  (ECF No. 22-13.)  Specifically, the SEC requested that Strategic produce "[a]ll documents evidencing, showing, and reflecting Bearpot's marijuana facility, including . . . the location and/or address of such facilities" (Request No. 4), "[d]ocuments sufficient to identify the location, specifications . . . and ownership of [the] 'Marijuana Growing facility located in Teller County, Colorado,' as described in a press release issued by [Strategic] on February 20, 2014" (Request No. 10), "[a]ll applications, permits, licenses, and other

documents provided to or issued by the State of Colorado, Colorado's Marijuana Enforcement Division, or any other regulatory agency in the State of Colorado in connection with [Strategic]'s and Bearpot's entrance into the marijuana industry" (Request No. 17), and "[a]ll documents evidencing, showing, and reflecting Bearpot's authorization by the State of Colorado to cultivate, grow, and/or sell marijuana" (Request No. 18). (*Id.* at 6–8.)

Strategic responded to the SEC's subpoena on August 18, 2014. (ECF No. 22-16.) In response to Request No. 4 regarding the location of the marijuana cultivation facility, Strategic produced the documents bates numbered STRATEGIC 00020–STRATEGIC 00030, which consist of several March 2014 invoices for marijuana cultivation equipment that BearPot purchased. (ECF No. 22-16 at 2; ECF No. 34-18 at 21–31.) The invoices provide no information as to the location of BearPot's marijuana cultivation facility. (*See id.*) Strategic's August 18, 2014 subpoena response did not address Request No. 10 regarding the location, specifications, and ownership of the marijuana cultivation facility. (*See* ECF No. 22-16.) In response to Request No. 17 regarding any permits and licenses issued by Colorado regulatory agencies, Strategic responded, "No documents." (ECF No. 22-16 at 3.) In response to Request No. 18 regarding BearPot's authorization by the State to grow or sell marijuana, Strategic responded, "No documents, other than the laws of the state of Colorado." (*Id.*)

Strategic provided the SEC with a supplemental response to the July 9, 2014 subpoena on August 28, 2014. (ECF No. 22-17.) In its supplemental response to Request No. 4, Strategic produced the documents bates numbered STRATEGIC 00097–STRATEGIC 000104, which consist of a list of BearPot's January–July 2014 banking transactions, several receipts from May and June 2014 BearPot purchases, a copy of a June 1, 2014 check written by BearPot for "Equipment," and two invoices, one of which was for electrical services performed at 847 Ridge Road, Divide, Colorado, on or around March 17, 2014. (ECF No. 22-17 at 2; ECF No. 34-19 at 2–9.) In response to Request No. 10, Strategic produced the documents bates numbered STRATEGIC 000105–STRATEGIC

000111, which consist of an unsigned residential lease for the property located at 847 Ridge Road, Divide, Colorado. (ECF No. 22-17 at 2; ECF No. 34-19 at 10–16.) The parties stipulate that the Ridge Road property is located in unincorporated Teller County. (ECF No. 22-3, ¶ 4.)

## II. PROCEDURAL HISTORY

Plaintiff SEC commenced this action by filing a complaint in this Court on February 29, 2016. (ECF No. 1.) It filed an amended complaint on July 22, 2016. (ECF No. 18.) Defendants answered Plaintiff's amended complaint on August 8, 2016. (ECF No. 19.)

Plaintiff filed the instant motion for partial summary judgment on December 20, 2016. (ECF No. 22.) Defendants filed their opposition to Plaintiff's motion on January 17, 2017. (ECF No. 24.) Plaintiff filed a reply in support of its motion on January 20, 2017. (ECF No. 26.) The Court heard oral arguments on Plaintiff's motion on March 16, 2017. (ECF No. 31.) As directed by the Court (*see* ECF No. 32), on March 29, 2017, Plaintiff filed the Appendix to the November 14, 2016 stipulation of the parties (ECF No. 34), which had been previously filed as Exhibit 1 to the declaration of Andrew O. Schiff filed in support of the SEC's motion for partial summary judgment (*see* ECF No. 22-3).

## III. LEGAL STANDARDS

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is appropriate if the materials in the record, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (en banc).

Each party's position as to whether a fact is disputed or undisputed must be supported by: (1) citation to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) a showing that the materials cited do not establish the presence or absence of a genuine dispute or that the

opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3). If a party seeking summary judgment supports its motion by declaration, the declaration must set out facts that would be admissible in evidence and show that the declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). An affidavit will not suffice to create a genuine issue of material fact if it is "conclusory, self-serving . . . [and] lacking detailed facts and any supporting evidence." *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

When the party seeking summary judgment has carried its burden under Rule 56(c), the burden shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). The nonmoving party "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita*, 475 U.S. at 587. If the nonmoving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 325.

## IV. ANALYSIS

Plaintiff moves for summary judgment only with respect to its first cause of action against Defendants Strategic and Fellner. Plaintiff argues that Defendants, through the issuance of Strategic's February and March 2014 press releases, violated Section 10(b) of the 1934 Securities Exchange Act and SEC Rule 10b-5 thereunder.[2] (ECF No. 22-1 at 5.)

### A. Applicable Law

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful

for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce . . . [t]o use or employ, in connection

---

[2] Although the press releases were issued by Defendant Strategic (*see* ECF Nos. 22-7 to 22-12), Plaintiff asserts, and Defendants admit, that Defendant Fellner, in light of his position at Strategic, had the ultimate authority over the content of the press releases. (ECF No. 18, ¶ 24; ECF No. 19, ¶ 23.)

with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance.

15 U.S.C. § 78j(b); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010).  SEC Rule 10b-5, which was promulgated under Section 10(b), makes it unlawful

for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

17 C.F.R. § 240.10b-5(b); *Platforms Wireless*, 617 F.3d at 1092.

Thus, to prevail on summary judgment on its Section 10(b) and Rule 10b-5 claim, the SEC must show that there is no genuine dispute of material fact as to whether Defendants (1) made a material misrepresentation or omission (2) in connection with the purchase or sale of any security (3) by use of any means or instrumentality of interstate commerce (4) with scienter.  *See SEC v. Phan*, 500 F.3d 895, 907–08 (9th Cir. 2007) (quoting *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001)).

## B. Defendants Made Material Misstatements and Omissions in Strategic's February and March 2014 Press Releases

Section 10(b) and Rule 10b-5 prohibit the making of material misstatements or omissions. *Dain Rauscher, Inc.*, 254 F.3d at 856.  A misstatement or omission is "material" if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Platforms Wireless*, 617 F.3d at 1092 (quoting *Phan*, 500 F.3d at 908).  As such, Section 10(b) and Rule 10b-5 "impose[] a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading." *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992)).  A statement or omission is "misleading" "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Exploration*

*(Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)).

The determination of materiality in securities fraud cases "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a give set of facts." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Therefore, these assessments "should ordinarily be left to the trier of fact." *Phan*, 500 F.3d at 908 (citing *In re Apple Computer Secs. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989)). "Only if the established omissions are 'so obviously important to an investor that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved 'as a matter of law' by summary judgment." *TSC Indus., Inc.*, 426 U.S. at 450 (quoting *Johns Hopkins University v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970)).

Plaintiff argues that Defendants made material misstatements and omissions in Strategic's February and March 2014 press releases. The press releases, Plaintiff argues, misled the public to believe that Strategic was acquiring, and then did acquire, a functioning marijuana cultivation facility that could quickly yield revenue when in fact it was prohibited from legally growing and distributing marijuana. (ECF No. 22-1 at 14–16.)

As the SEC correctly points out, Strategic was prohibited from operating its marijuana cultivation facility under two facets of Colorado law. First, the Colorado Retail Marijuana Code requires that all retail marijuana establishments, including marijuana cultivation facilities, be licensed by the Colorado State Licensing Authority. Colo. Rev. Stat. §§ 12-43.4-103(17), -309(2) (2016). In 2014, when Strategic acquired BearPot and published the press releases at issue, the Code expressly prohibited the issuance of a license to the owner of a marijuana cultivation facility who had not been a resident of Colorado for at least two years prior to the date of the owner's license application. Colo. Rev. Stat. § 12-43.4-306(k) (2013). Both Strategic and Fellner qualified as owners of the Colorado marijuana facility under Colorado licensing laws. *See* 1 Colo. Code Regs. §§ 212-2.103, .204 (2013). However, neither Defendant was a Colorado resident and therefore both

Defendants were precluded from obtaining the license necessary to operate the facility.

Second, in 2013, Teller County, Colorado, the county in which Strategic's facility was located, prohibited all marijuana businesses within its unincorporated boundaries. *See* Teller County, Colo., Ordinance 18 (March 14, 2013). Thus, when Strategic acquired BearPot and its existing marijuana cultivation facility in February 2014, it was prohibited under the March 2013 Teller County Ordinance from operating the facility on Ridge Road.

Not one of Strategic's February and March 2014 press releases mentioned that Defendants were prohibited from legally operating the marijuana cultivation facility that Strategic had acquired. To the contrary, Strategic's press releases contained statements that would lead the public to believe that Strategic was legally operating a functioning marijuana cultivation facility that would soon yield revenue. The first press release, dated February 10, 2014, stated that Strategic had "entered into meaningful negotiations for the purchase of a Marijuana Growing facility located in Teller County, Colorado" and, after having "fully evaluated the industry," expected to "yield a harvest and generate revenues from the sale of plants by the 3rd Quarter of [2014]." (ECF No. 22-7 at 2.) The press release made no mention of Teller County's prohibition against all marijuana establishments or Defendants' inability to obtain a license to operate the cultivation facility based on their residency.

The second press release, dated February 20, 2014, announced that Strategic had "completed negotiations[] and . . . signed an agreement for the purchase of Bearpot, Inc., [the] controlling entity of an existing Marijuana Growing facility located in Teller County, Colorado." (ECF No. 22-8 at 2.) The press release stated that the acquisition brought with it "existing equipment and inventory" and that plans for the marijuana cultivation facility were already underway. (*Id.*) Strategic claimed that it had "evaluated the industry and expect[ed] to be able to yield a harvest and generate revenues from the sale of plants by the 4th Quarter of th[e] year." (*Id.*) The press release made no mention of Teller County's prohibition against all marijuana establishments or Defendants' inability to obtain a license to operate the cultivation facility.

The third press release, dated February 24, 2014, declared that Strategic "[n]ow . . . own[ed]" and was "the controlling entity for" a marijuana growing facility. (ECF No. 22-9 at 2.) In addition, the press release stated that Strategic had "started drafting a short term plan to modernize and expand the cultivation processes in the facility." (*Id.*) Again, Strategic noted that it anticipated its "first yield to harvest and generat[e] additional revenues with the expanded capabilities by Q4 of 2014" and did not mention the Teller County Ordinance or Defendants' inability to obtain a license to operate the facility. (*Id.*)

The fourth press release, dated February 25, 2014, stated that Strategic was working with BearPot's president "to develop and expand further into the Colorado Marijuana market." (ECF No. 22-10 at 2.) This press release acknowledged, for the first time, that the marijuana cultivation facility was not yet licensed; however, it did not suggest that obtaining a license would be problematic. Instead, it stated that BearPot had the funding from Strategic to "make sure [it would] be properly licensed and permitted." (*Id.*) Strategic reiterated that it had "evaluated the industry and expect[ed] to be able to yield a harvest and generate revenues from the sales by the 4th Quarter of th[e] year." (*Id.*) The press release made no mention of the Teller County Ordinance or Defendants' legal inability to obtain said licenses and permits.

The fifth press release, dated February 28, 2014, summarized an interview of Defendant Fellner by SmallCapReporter regarding Strategic's entrance into the Colorado marijuana market. (ECF No. 22-11.) SmallCapReporter posted the interview transcript online the same day that the press release issued. (ECF No. 22-21.) The press release quoted Defendant Fellner as having stated during the interview that "[t]he largest amount of growth that we will see in the next 3–6 months for [Strategic] will surely be in the growing and distributing of medical and recreational marijuana." (ECF No. 22-11 at 2.) When asked during the interview what Defendant Fellner thought were the key risks Strategic then-currently faced, he responded, "The key risks that the company faces right now are really related to human resources and making sure that all of our new employees are hard working and responsible. As far as the market goes we are doing great and I

couldn't be happier with the volume in the stock." (ECF No. 22-21 at 2.) Neither the press release nor the interview transcript made any mention of Teller County's prohibition against all marijuana establishments or Defendants' inability to obtain a license to operate the cultivation facility.

In the sixth and final press release, dated March 27, 2014, Strategic stated that it had experienced "a very busy quarter." (ECF No. 22-12 at 2.) Defendant Fellner, on behalf of Strategic, articulated the company's "intent to keep [its] shareholders and investor fully informed . . . ." (*Id.*) The press release announced that BearPot had completed "all electrical and structural upgrades to [the] facility," a "new state of the art equipment purchase from Growlife," and "the installation of all new equipment at [the] facility." (*Id.*) It continued, "We have acquired the highest quality equipment for this operation, and are confident that the facility will run extremely efficient [sic]." (*Id.*) The press release did not mention Teller County's prohibition against all marijuana establishments or Defendants' inability to obtain a license to operate the cultivation facility.

Based on the foregoing facts, the Court concludes that there is no genuine issue of fact as to whether Strategic's February 10, 2014 through February 25, 2014 press releases contained material misstatements and omissions of material facts.[3] Strategic represented both that it had "evaluated" or "fully evaluated the industry" and that it expected to "yield a harvest" and "generate revenues" within the year. (*See* ECF Nos. 22-7 to 22-10.) There is no doubt that the disclosure that Strategic's marijuana cultivation facility was located in a county that prohibits these facilities and that Defendants were prohibited from obtaining a license to legally operate the facility based on their residency would have been viewed by the reasonable investor as having significantly altered the total mix of information that Strategic provided to the public. Due to the material misstatements and omissions in Strategic's press releases, the press releases were misleading. Without question, Strategic's press releases would have given the reasonable investor the impression of a

---

[3] Because these four press releases are clearly misleading, the Court need not evaluate the last two press releases.

state of affairs—that Strategic had acquired and was legally operating a marijuana cultivation facility—that differed materially from the one that actually existed—that Strategic's operation of its Colorado marijuana cultivation facility was a legal impossibility.

Defendants, in their opposition, offer a number of arguments as to why Plaintiff should not prevail on summary judgment with respect to this issue. For the reasons below, Defendants' arguments fail.

First, Defendants argue that Strategic's press releases were not misleading because Strategic "moved [its] facility to El Paso County, where marijuana cultivation is legal." (ECF No. 24 at 6.) In support of this claim, Defendants point to Strategic's September 2014 SEC Form 1-A, which states, "We had only a small facility in El Paso County, Colorado where we grew approximately 50 marijuana plants." (ECF No. 24-1 at 23.) Plaintiff objects to Defendants' use of Strategic's own out-of-court statement to prove the truth of the fact that Strategic moved its facility to El Paso County on the basis that this statement is inadmissible hearsay. (ECF No. 26 at 5–6 (citing Fed. R. Evid. 801(c)).)

A district court may consider hearsay evidence submitted in an inadmissible form at the summary judgment stage. *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016). However, it may do so only if the content of the evidence proffered could later be provided in an admissible form at trial. *Id.*; *see Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). When a party objects that material cited to dispute a fact cannot be presented in a form that would be admissible at trial, as Plaintiff does here, the burden shifts to the proponent of the evidence to either show that the material is admissible as presented or explain the admissible form that it anticipates it will produce at trial. Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment.

Here, neither side fully or adequately analyzed in their pleadings the issues of admissibility with respect to Strategic's September 2014 Form 1-A. Moreover, neither side was prepared to meaningfully address these issues at oral argument. After some prompting, Defendants suggested the document would be admissible as a business record

under Federal Rule of Evidence 803(6) or as a public record under Federal Rule of Evidence 803(8) through the testimony of a witness from the SEC. Both of these exceptions to the hearsay rule can be defeated if the opponent of the evidence shows that "the source of information or the method of circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E), 803(8)(B). At oral argument, Plaintiff called into question the trustworthiness of the contents of Strategic's September 2014 Form 1-A. However, the vague arguments of the parties did not address the specifics necessary for the Court to rule on Plaintiff's objection to the admissibility of this document.

Ultimately, the Court need not determine the admissibility of Strategic's Form 1-A, as Defendants have an even more fundamental problem than that of admissibility. Specifically, Strategic's Form 1-A, even if assumed to be admissible, does not create a genuine dispute of material fact. As stated above, Strategic's Form 1-A is proffered as the only evidence in support of Defendants' claim—made only in their opposition and not in any supporting declaration—that Strategic, "shortly [after purchasing the existing cultivation facility,] moved [its] facility to El Paso County, where marijuana cultivation is legal." (ECF No. 24 at 6.) To be material, any evidence of an alleged move of the facility to El Paso County must be tied to the period when Strategic issued the press releases that are the subject of this litigation. There is no such evidence in the record. To the contrary, on August 28, 2014, five months after the last of the relevant press releases issued, Strategic responded to the SEC's subpoena for all documents "evidencing, showing, and reflecting Bearpot's marijuana facility, including . . . the location and/or address of such facilities" and documents "sufficient to identify the location . . . of [the] 'Marijuana Growing facility located in Teller County, Colorado,' as described in a press release issued by [Strategic] on February 20, 2014 . . . [and] all other Bearpot growing facilities or growing houses." (ECF No. 22-13 at 6–7.) The only documents produced by Strategic responsive to the issue of the location of the marijuana growing facility were the lease for the residential property located at 847 Ridge Road in unincorporated Teller County and an invoice for electrical services performed at that property on or around March 17, 2014. (ECF No. 22-17; ECF

No. 34-19 at 1–16.)  No documents produced in response to the SEC's subpoena indicate in any way a move of the cultivation facility to El Paso County.  (*See* ECF No. 34-18, ECF No. 34-19.)  Furthermore, Defendants conceded at oral argument that they have no admissible evidence of a move date.  Thus, Defendants fail to point to any evidence that places into dispute the material fact that *at the time* the subject press releases issued, Defendants could not have operated the BearPot marijuana cultivation facility because it was located within the unincorporated area of Teller County.

Second, Defendants argue that Strategic's press releases were not misleading because the requirement that Defendants be Colorado residents for at least two years before obtaining a license to operate the marijuana cultivation facility was repealed on June 10, 2014.  (ECF No. 24 at 6.)  Here, Defendants' assertion is simply legally incorrect.  The residency requirement set forth in the Colorado Retail Marijuana Code was repealed on June 10, *2016*, over two years after Strategic acquired BearPot and published the press releases at issue.  *See* S. 40, 70th Gen. Assemb., 2d Reg. Sess. (Colo. 2016).[4]  Thus, there is no genuine issue for trial with respect to whether the residency requirement was in place at the time Strategic acquired BearPot and issued the February and March 2014 press releases.

Third, Defendants argue that Strategic's press releases did not contain material misstatements and omissions because they informed the public only of the company's *intention* to enter the Colorado marijuana industry and did not indicate that Strategic was conducting a business.  (ECF No. 24 at 6–7.)  Further, Defendants appear to argue that its press releases contained only forward-looking statements that were protected by the "Safe Harbor" language that Strategic included in the releases.  Specifically, the "Safe Harbor" declarations contained in the press releases stated, "Forward-Looking Statements are

_____

[4] The Court takes judicial notice of these regulations.  *See Martinez v. Welk Group, Inc.*, No. 09-cv-2883 MMA (WMc), 2011 WL 90313, at *2 (S.D. Cal. Jan. 11, 2011) ("Courts routinely take judicial notice of state or federal statutes and regulations.").  Furthermore, Defendants conceded this point at oral argument on March 16, 2017.

included within the meaning of Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934, as amended," that such forward looking statements "involve risks, uncertainties and contingencies, many of which are beyond [Strategic's] control," and that Strategic is "under no obligation to (and expressly disclaim any such obligation to) update or alter [its] forward-looking statements, whether as a result of new information, future events or otherwise." (ECF Nos. 22-7 to 22-12.)

This argument fails to create a genuine issue of fact for trial. As discussed above, Strategic's press releases went well beyond a statement of the company's mere intention to undertake a new business venture. The press releases gave the public the unmistakable false impression that Strategic had acquired a functioning marijuana cultivation facility with existing equipment and inventory that would generate revenue in the short term. For the reasons addressed above, Defendants' failure to mention that Strategic was barred from obtaining a license to legally operate a marijuana cultivation facility as contemplated in the press releases was misleading and material.

In addition, the Safe Harbor provisions of the Securities Litigation Reform Act of 1995 do not apply in the instant case. As Plaintiff correctly points out in its reply, the protections afforded by the Safe Harbor provisions applies only in private securities actions and not in enforcement actions brought by the SEC. *See* 15 U.S.C. §§ 77z-2(c)(1), 78u-5(c)(1); *Gebhart*, 595 F.3d at 1041 n.9. Furthermore, Congress expressly excluded all issuers of penny stocks from the protections afforded by the Safe Harbor provisions. *See* 15 U.S.C. §§ 77z-2(b)(1)(c), 78u-5(b)(1)(c).[5] Thus, any litigation protections offered by the Safe Harbor provisions are inapplicable here.

Finally, Defendants argue that Plaintiff should not prevail on summary judgment because Strategic's press releases did not have an influence over Strategic's investors or an effect on Strategic's stock value. (ECF No. 24 at 7–8.) This argument, like Defendants' others, fails to create a genuine issue of material fact. As Plaintiff correctly points out in

---

[5] At the March 16, 2017 oral argument, Defendants conceded that they had nothing to refute this authority.

its reply, materiality in the context of securities fraud does not depend on a demonstration of a market reaction to a misstatement. *United States v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011). Thus, a lack of a positive reaction from the stock market to the press releases is irrelevant to the materiality of the misstatements and omissions contained therein.

For the reasons above, the Court concludes that no reasonable juror could find that Defendants did not make material and misleading misstatements and omissions in Strategic's February 10, 20, 24, and 25, 2014 press releases.

## C. Defendants' Material Misstatements and Omissions Were Made in Connection with the Purchase or Sale of a Security

In the context of Section 10(b) and Rule 10b-5, false and misleading statements are made "in connection with" securities trading whenever such statements are made "in a manner reasonably calculated to influence the investing public." *McGann v. Ernst & Young*, 102 F.3d 390, 393 (9th Cir. 1996) (quoting *Wessel v. Buhler*, 437 F.2d 279, 282 (9th Cir. 1971)). Liability under Section 10(b) extends to material fraudulent statements contained in a publicly disseminated document, "such as a press release . . . on which an investor would presumably rely." *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993); *see also Phan*, 500 F.3d at 908.

The Court concludes that there is no question of fact as to whether the "in connection with" requirement is satisfied here. Defendants' material misstatements and omissions were made in press releases that were publicly disseminated and intended to influence potential investors. The February 24, 2014 press release specifically states that the purpose of that communication was to maintain an "active line of communication with current and potential shareholders." (ECF No. 22-9 at 2.) Thus, the Court concludes that the "in connection with" requirement is met. Defendants fail to provide any evidence to the contrary.[6]

---

[6] Defendants do not address in their opposition whether the misstatements and omissions were made in connection with the purchase or sale of a security. (*See* ECF No. 24.) At oral argument on March 16, 2017, Defendants conceded that they do not dispute the evidence as to this element.

**D.    Defendants' Material Misstatements and Omissions Were Made by Use of an Instrumentality of Interstate Commerce**

The Ninth Circuit has explicitly held that "the Internet is an instrumentality and channel of interstate commerce." *United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) (quoting *United States v. Trotter*, 478 F.3d 918, 921 (8th Cir. 2007) (per curiam)). By disseminating its press releases via the Internet, Strategic made its material misstatements and omissions by use of an instrumentality and channel of interstate commerce. There is no issue of fact for trial with respect to this element.[7]

**E.    Defendants' Material Misstatements and Omissions Were Made with Scienter**

Scienter, within the context of section 10(b) and Rule 10b-5, "is the 'mental state embracing intent to deceive, manipulate, or defraud.'" *SEC v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). Reckless conduct may also constitute scienter. *Id.* (citing *Dain Rauscher, Inc.*, 254 F.3d at 856); *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010). The Ninth Circuit has adopted the following standard with respect to reckless conduct in the context of securities fraud actions:

> [R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*In re VeriFone Holdings, Inc. Securities Litigation*, 704 F.3d 694, 702 (9th Cir. 2012) (quoting *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc)). Scienter requires a subjective inquiry into a defendant's actual state of mind. *Gebhart*, 595 F.3d at 1042. Courts may consider the objective unreasonableness of a defendant's conduct

---

[7]    Defendants also do not address in their opposition whether the misstatements and omissions were made by use of an instrumentality of interstate commerce. (*See* ECF No. 24.) At oral argument on March 16, 2017, Defendants conceded that they do not dispute the evidence as to this element.

to raise an inference of scienter; however, the ultimate question is whether the defendant knew his statements were false or was consciously reckless as to their truth or falsity. *Id.*; *see Ernst & Ernst*, 425 U.S. at 206 ("There is no indication that Congress intended anyone to be made liable [under Section 10(b)] unless he acted other than in good faith.").

Plaintiff argues that it was, at a minimum, deliberately reckless for Defendants to announce Strategic's imminent entry into a market without disclosing the legal prohibitions to its doing so. (ECF No. 22-1 at 6, 18.)

Defendant Fellner has consistently invoked his Fifth Amendment privilege not to testify about the press releases. At Defendant Fellner's December 13, 2016 deposition, the SEC asked Fellner whether, prior to March 27, 2014, he attempted to find out or received any information about whether: (1) marijuana cultivation was permitted in unincorporated Teller County, Colorado; (2) Strategic or BearPot would be able to obtain a Colorado license to cultivate marijuana; and (3) his status as a nonresident of Colorado would affect the ability of Strategic or BearPot to obtain a Colorado license to cultivate marijuana. (ECF No. 22-19 at 4–5.) Fellner responded, "I take the Fifth," to all of the SEC's inquiries. (*Id.*) In addition, Mr. Fellner declared that he would continue to assert the Fifth Amendment privilege regarding all questions pertaining to Strategic's entry into the Colorado marijuana cultivation market, the press releases Strategic issued in February and March 2014, and any other matters related to the amended complaint in this case. (*Id.* at 5.) Due to Defendant Fellner's consistent invocation of the Fifth Amendment privilege, Plaintiff urges this Court to draw an adverse inference against Defendants and shift to them the burden of proving their good faith. (ECF No. 22-1 at 6, 18.)

Parties are free to invoke the Fifth Amendment in civil cases, but when they do, courts are equally free to draw adverse inferences from their failure to offer proof. *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998). In addition, district courts have broad discretion in responding to a party's invocation of the Fifth Amendment. *Id.* For example, a district court may shift the burden of proof on summary judgment to the party who invokes the privilege. *Id.* On summary judgment, an adverse inference alone is not enough to support

the absence of a genuine dispute of material fact. *Id.* at 678 (citing *Lefkowitz v. Cunningham*, 431 U.S. 801, 808 n.5 (1977); *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). Such an inference may be drawn only when there is independent evidence of the fact to which the party refuses to answer. *Id.*; *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000). When there is no corroborating evidence to support the fact under inquiry, no negative inference is permitted. *Glanzer*, 232 F.3d at 1264.

Defendants argue that public policy should preclude the shifting of the burden to the them because they invoked their Fifth Amendment rights to protect them from prosecution under federal marijuana laws unrelated to the "claims and allegations in this case." (ECF No. 24 at 5.) Defendants provide no evidence to support this factual assertion and cite no authority for their legal position.

The Court finds that Plaintiff sets forth sufficient independent evidence for the Court to draw the adverse inference that Defendants acted with scienter when they made material misstatements and omissions in the press releases at issue. Three of Strategic's press releases claimed that the company had "evaluated the industry" or "fully evaluated the industry" and "expect[ed] to be able to yield a harvest and generate revenues from the sale" by the 3rd or 4th Quarter of 2014. (ECF Nos. 22-7, -8, -10.) Due to the legal prohibitions that Strategic faced with respect to operating its marijuana cultivation facility, it cannot be that both of these statements are true. If it were true that Strategic fully evaluated the industry, it must have learned that it could not legally operate the facility that it acquired. Thus, it can only be that Strategic either: (1) knowingly made the false statement that its facility could generate revenue in 2014 after learning that it legally could not; or (2) knowingly made the false statement that it evaluated the industry when it in fact had not, while also being consciously reckless with respect to the truth or falsity of its statement that its facility was poised to generate revenue in 2014. Thus, the Court finds that there is independent corroborating evidence of Defendants' *mens rea* and this Court may properly draw an adverse inference from Defendant Fellner's Fifth Amendment invocation and shift to Defendants the burden of proving that they did not act with scienter when they issued

the subject press releases.

Defendants fail to meet this burden. First, Defendants argue that they did not act with scienter because neither Defendant Strategic nor Defendant Fellner were trading in the market during the relevant period. (ECF No. 24 at 8.) This argument is not only irrelevant but also unsubstantiated by any materials in the record.

Second, Defendants argue that they did not act with scienter because they made significant efforts to comply with Colorado law by consulting with Clifton Black, an attorney who specialized in Colorado's new marijuana laws. (ECF No. 24 at 3.) This argument fails to preclude summary judgment against Defendants. To establish an advice of counsel defense, Defendants must show that they made a full disclosure of all material facts to their attorney and that they relied in good faith on the specific course of conduct recommended by the attorney. *United States v. Bush*, 626 F.3d 527, 539 (9th Cir. 2010) (citing *United States v. Ibarra-Alcarez*, 830 F.2d 968, 973 (9th Cir. 1968)). Defendants do not argue that they disclosed to attorney Black the Teller County location of their marijuana cultivation facility and the fact that Defendant Fellner was a California resident; that attorney Black, aware of these facts, advised Defendants that they could legally operate the marijuana cultivation facility that they had acquired; or that Defendants relied in good faith on that specific advice. Instead, Defendants have asserted the attorney-client privilege with respect to their communications with attorney Black. (ECF No. 24-1 at 11.) This Court will not permit Defendants to assert an advice of counsel defense and at the same time refuse to disclose the nature of their communications that form the basis for the defense. *See Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001) (holding that a district court may preclude a defendant from invoking the advice-of-counsel defense when he refused to answer questions regarding relevant communications with counsel); *see also Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) ("The privilege which protects attorney-client communications may not be used both as a sword and shield.").

///

Even if the Court considered Defendants' advice-of-counsel defense, the defense would still fail to defeat Plaintiff's motion for summary judgment for lack of factual support. The November 28, 2016 letter from attorney Black to Plaintiff's counsel that Defendants proffer in support of their defense indicates that Defendants did not consult with attorney Black until at least February 14, 2014, four days *after* Strategic's first press release claimed that Strategic had "fully evaluated the industry." (ECF No. 24-1 at 11.) Thus, even fully crediting an advice-of-counsel defense as of February 14, 2014, Defendants would still face summary judgment of this claim based upon the February 10, 2014 press release.

Third, Defendants argue that they did not act with scienter because they retained two marijuana consulting firms to assist with the business. (ECF No. 24 at 3.) This argument also fails to defeat summary judgment against Defendants. According to Defendants, Strategic consulted with the two firms on "how best to produce medical marijuana," "which kinds of plants to grow and then how to convert it to oils or edibles including identifying the amount of THC or CBDs in each oil or edible," and "how to set up the overall grows as to the type of greenhouses, HVAC systems, growing equipment and variety of plants, as well as other details such as soil nutrients and how to properly trim the flowers and make best use of all flowers and trim." (*Id.*) Defendants neither argue that they consulted with the firms regarding the legality of Strategic's marijuana cultivation facility nor proffer any evidence that supports the fact that Defendants obtained and relied in good faith upon advice from the consulting firms regarding the legality of Strategic's cultivation facility. (*See id.*) Thus, Defendants fail to show how their retention of the consulting firms creates a genuine dispute of material fact for trial as to whether Defendants acted with scienter when they made material misstatements and omissions regarding Strategic's legal ability to operate its marijuana cultivation facility.

Finally, Defendants argue that they did not act with scienter because they moved the cultivation facility from Teller County to El Paso County, where marijuana cultivation is legal. (ECF No. 24 at 3.) As discussed above, this claim fails to defeat Plaintiff's motion

for summary judgment because Defendants have failed to put forth any evidence tying any such claimed move to the time that the subject press releases issued. And, in any event, moving the facility to El Paso County would not remedy the second legal prohibition to Defendants' operating their marijuana cultivation facility, that Defendant Fellner could not obtain a license to operate the marijuana cultivation facility due to his being a California resident. Accordingly, Defendants' assertion that they moved the cultivation facility to El Paso County fails to meet their burden on the issue of scienter.

For the reasons above, the Court concludes that no reasonable juror could find that Defendants did not act with scienter when they made material misstatements and omissions in the subject press releases.

## V. CONCLUSION

For the reasons above, Plaintiff's motion for partial summary judgment (ECF No. 22) is **GRANTED**.

**IT IS SO ORDERED.**

Dated: April 17, 2017

Hon. Jill L. Burkhardt
United States Magistrate Judge